Good morning, Your Honors, and may it please the Court. Doug Dennington for Appellant Department Association of Greater Los Angeles. I would like to reserve three minutes of time for rebuttal, if I might, and I will do my best to keep track. Your Honors, in this case, the District Court abused its discretion when it denied Appellant's motion for preliminary injunction, finding that the Appellant had not demonstrated a probability of success on the merits of the Appellant's contract clause claimed, and further finding that the Appellant had not demonstrated the requisite irreparable harm for issuance of provisional relief. Moreover, since September 1st of last year, the State of California has imposed a statewide residential eviction moratorium that basically provides security for tenants that contains more conditions and requirements than the City's ordinance. But it is in place today, and based on that, an invalidation of the City's eviction moratorium is just going to place landlords on the same footing as other landlords throughout the State of California. And based on that, our position is that the balancing of the equities tips in favor of AGLA and AGLA's housing provider members. Your Honors, just starting with the first argument, or the first, and I'll briefly cover this, but going to the probability of success on the merits on the contract clause claim and the substantial impairment prong. There were a few points that we shared common ground with the District Court on, but we do fully agree with the District Court's ultimate conclusion that the blanket City of Los Angeles eviction moratorium works a substantial impairment of the existing contractual relationships between landlords and their tenants in the City of Los Angeles. So the City and interveners argue that the Court erred in this regard, and they point to just the historic regulation of the landlord-tenant industry in general, and certainly we concede that this industry has been the subject of regulation in the past, and most commonly in the form of rent control. And, you know, the case law is pretty clear that the historic regulation to be relevant in the contract clause context has to be on the same topic. I believe one of the cases talks about it has to be in the same particulars. And so as the District Court found, you know, no landlord could have ever reasonably anticipated the breadth of what happened in the City of Los Angeles with respect to this eviction moratorium. Well, I mean, of course, you have to demonstrate that the substantial impairment, and the District Court did agree with you on that, but then you still have to show under the Supreme Court's cases that the state law and the city law here wasn't appropriate or reasonable. And so how do you overcome that? So that's the reasonable conditions component of the test. And so I'll move to that part of the test. And the reasonable conditions part of the test, we believe the District Court applied the wrong standard. The District Court applied basically a pure rational basis as you would in, you know, a classic subject due process setting. And that's not the standard for the contract clause, even for private contracts. The contract clause has a standalone defined test. And even as to the regulation and impairment of private contracts, the severity of the impairment, as the Supreme Court has indicated in two of the more recent cases, dictates the level of review. And that was first articulated in Allied Structural Steel, where I believe there's language to the effect that the severity of the impairment measures the height of the hurdle that the legislation must pass. And that is our position. How is that different from an unreasonableness test? I don't understand the difference. It sounds like a pretty floating scale that says, well, in light of what the first point, which is whether there's a substantial impairment, was the condition unreasonable? I'm not sure I understand where you think the District Court went wrong in applying this. Right. The District Court went wrong in applying this because the severity of the impairment in this case was, in our view, drastic. And, you know, you would have won this case going away if you were arguing in the 19th century. I agree. I absolutely agree. But after Blaisdell, you're in a deep fog. And Blaisdell dealt specifically with a mortgage moratorium. Absolutely. Very difficult to see that you've got a good argument after Blaisdell. And, Your Honor, if I might respond to that. In light of Blaisdell, we believe Blaisdell stands in favor of our position. We believe it supports our position. And the reason is, is when you're looking at these mortgage – and we're not dealing here with a mortgage moratorium. We're dealing here with an eviction moratorium. There's a big difference because a mortgage moratorium – let me back up. When you're looking at the contract clause and the reasonableness of the conditions that are imposed in the law, you're looking to see if the security behind the contract has been impaired or obliterated. And absolutely, in – well, in the case of Blaisdell, there was an impaired security, but not obliterated to the point where the mortgagee purchasers would not recover every dollar in the future that they have by way of the deed of trust or the security interest in the property. And what the Blaisdell court repeatedly said, and the district court and I had a little bit of a disagreement on this, but they referenced this requirement in Blaisdell that during the interim, during the period of the mortgage, if the mortgagor seeks relief from the court, then the court has – the county court – the county court has the discretion to provide that relief, extend the redemption periods, but the court had to mandate a reasonable rental value payment from the mortgagor to the mortgagee, which would be applied to the carrying cost. And so that is the reasonableness. That is – it was an extremely important component of the law, and it's why we believe Blaisdell or the Minnesota Mortuary – Okay. I understand the distinction between the mortgage and the rental situation. It's a good – it's a very good point. Okay. So explain to me how the Los Angeles ordinance – does it forgive rent outright? It does not, Your Honor. Okay. All right. So you have the possibility of recovering rent. Your renters are still liable, and I think we're all – we all understand that the likelihood of your clients being able to recover double rents in the future to account for rents that have been missed in the past is not likely. Did you bring a takings claim in this case? We did, Your Honor, but I represent an association, and a takings claim is difficult with – And it may not be right, but your clients, or at least the members of your organization, may have a takings claim in the future if they fail to collect the rent that is due them. But that's a ripeness problem, and I don't know how we could address that at this point. Well, and we're not asserting the takings argument as a basis to invalidate a law. As Justice Roberts recently pronounced in Nick v. Township of Scott in the takings analysis, you're not going to have federal courts invalidating laws because they constitute a taking. The remedy for a taking is just compensation. That's the government paying you the market value of what has been taken, and we're not asserting that as a basis to invalidate the law. Our claim is under the contract clause. And if I could just tie the end on why the eviction moratorium is different than a mortgage moratorium, it's that what the city has done is eliminated basically a landlord's security in its lease. Every lease is a risk. You know, a tenant makes an application. They present the application. The landlord does its credit check. The landlord will look at, you know, prior rent history. But even as to, you know, the most perfect tenant, you never know when a tenant's going to lose their job or, you know, suffer some other situation where they can't make their rent payments. So that risk, so how is that risk handled by landlords? The risk is, look, if in that circumstance we know we are going to be able to replace a nonpaying tenant with a paying tenant on short order, and that is through the unlawful detainer proceedings. So that, in my view, is the equivalent to the destruction of the mortgage securities, not in Blaisdell, but I would like to highlight another case that came the year after Blaisdell, Your Honor, and that is the Kavanaugh case. And to highlight the importance that the Supreme Court at that time placed upon this reasonable rental requirement as it was phrased in Blaisdell, the following year the court had occasion to address another mortgage moratorium. And in that case there was no requirement that the party in possession make any payment to the mortgagee purchaser. And because of that, and, you know, admittedly that was a much more aggressive moratorium than the one in Blaisdell, and it was not limited to the emergency. By the way, Your Honors, this moratorium is not limited to the emergency either because it allows a one-year grace period at the conclusion of the emergency for tenants to pay back. I mean, by definition, it's not limited to the emergency. That's not our main argument, obviously. But the thing is, because they've destroyed our security, and that security is, you know, expedited, summary, unlawful detainer proceeding, they've destroyed all security in our leases. And so that is the reasonableness test. And again, that's why this is such a drastic and severe impairment. And so the level of review, according to the Supreme Court, has to go, has to be extended, has to be raised to meet that hurdle. And that's referenced both in Allied Structural Steel as well as in the following case, Energy Reserves. I don't know if I answered all your questions on that, Judge Bybee. I don't know whether you answered my satisfaction, but I think you were responsive, and I appreciate that. Okay. All right. The city argues that, you know, that we omitted the Hahn case. That was the case that came right after, well, not right after. It was about 10 years after the Kavanaugh decision in 1945. That's Blaisdell. That was another Minnesota, or not Minnesota moratorium. I believe that was the New York moratorium that also came out of the Great Depression. And in that case, there was actually, you know, year over year modifications to the moratorium. And the requirement was, again, in that case, why we believe that it survived contract clause scrutiny, is that there was a requirement that the party in possession, the mortgagor in a homeowner setting, the homeowner, pay to the mortgagee, the lender, the carrying costs, insurance and interest during the interim. That's why the security was not obliterated. And then I believe also in that case, in that moratorium, as the economy progressively improved closer to 1945 when the decision came out, then the legislators started imposing incremental mandatory increases in payments of a percentage of the actual principal. In the time since the Supreme Court has announced the reasonableness, the appropriate reasonableness test, is there any case that's allowed a commerce clause challenge, you know, where they've found a substantial impairment, but then nonetheless found it was unreasonable under that test? They found that there was a substantial impairment and unreasonable? Is there any case in this kind of modern era of commerce contracts clause case law from the Supreme Court or any court where a court struck down a law as unreasonable under this modern formulation? Yeah, U.S. Trust in 1977 and Allied Structural Steel, both invalidated. The energy reserves case that followed the Allied Structural Steel case, that was a case where the court actually found that that was just a price regulation. They were trying to put, I guess, intrastate natural gas prices on par with the interstate gas prices that had been regulated by Congress. And the Supreme Court had found in that case that there was not a substantial impairment, but went ahead and what I guess would be dicta, analyzed the second prong and said it was reasonable and would satisfy that as well, that it was reasonably conditioned. But neither of those cases deal with the total destruction of the security for the contract. And as I say, the security for the contract in this case is the ability to replace a nonpaying tenant with a paying tenant, because once that's gone, there's no way a landlord can ever mitigate his damages. That time is gone. And it is also, in our view, irreparable. I don't know if the court wants me to get into that issue. I see that my time is coming to… Would you like to reserve the rest for rebuttal? I think I would, Your Honor. Okay. Thank you. We'll hear from the Applees. I know you've divided your time, and we're going to allow Mr. Knapp to make sure he gets his five minutes that you all have agreed to. So, Mr. Eisen, you'll have 15 minutes, and then Mr. Knapp will hear from you for the five minutes that you've asked for. Thank you, Judge Bress. Good morning, and may it please the Court. I think I'll start with the easiest way that the Court could affirm the District Court's judgment.  That puts the burden on AGLA to demonstrate that there's no case when it could constitutionally be applied, when the ordinance could constitutionally be applied. They sought very expressly to enjoin it in every application. But the ordinance applies to leases that both pre-date and post-date its enactment. And as to every lease that post-dates its enactment, it can't possibly impair the lease if it's applied. That alone is enough to show that there is no abuse of discretion in denying a preliminary injunction here. And that's enough to affirm without going any further. So, I just want to make sure I understand. So, if it applies to leases that post-date, then the ordinance itself is part of the background law. This would be a very, very 19th century principle, but it's part of the law of contract, binding the parties before they enter into the contract. That is, the landlord now enters into a lease knowing that he cannot evict the tenant. Is that correct? That's correct. And that being the case, for any lease that was entered after the enactment of the ordinance, there can't possibly be a substantial impairment. It's a matter of law. So, that's enough to doom a facial challenge from the get-go. And if you're looking for a reason to avoid delving through the many other layers of correct, or at least non-abuse of finding that the district court made before you get to the constitutional question, that's the first off-ramp. We can continue through several others because, as the court knows, it's Mr. Dennington's burden to show that the district court abused its discretion and its findings on each of the four winner factors to get a reversal here. That would mean he would have to show that it was illogical or implausible, for example, for the district court to conclude that the public interest is better served by protecting tenants from homelessness at the expense of a compensable economic injury to landlords. I don't think he's shown that. He would have to show that it was illogical or implausible to conclude that there was no demonstration of irreparable harm here, and there wasn't one. And then he would have to show only after that that the district court erred in its legal conclusion as to whether there was a contract clause violation here. Mr. Eisenman, recognizing what the Supreme Court has said and the direction it's taken the contract clause in, do you think there are any limits here on what the city could have done from a contract clause perspective? I mean, here, for example, there's a one-year grace period afterwards. What if the grace period was 20 years? What if the eviction moratorium goes on for another five or six years? Are there any contract clause problems at any point? Judge Bress, I'm sure there would be. I don't think it's beneficial to speculate in a vacuum as to when they would arise. The city council, the state government, and the federal government have all approached this evolving emergency with some degree of flexibility. And there's give and take between, for example, there is an eviction moratorium on the one hand. On the other hand, there's financial benefits flowing from the other governments to landlords to try and alleviate the pain that they may be feeling from losing rents. As the situation evolves and moves forward, it's hard to know or to anticipate when, perhaps, it would become unreasonable. At 20 years, I think it would be hard to deny that it would be unreasonable. At some point before that, perhaps. But I don't think it's beneficial to draw that line in a vacuum, particularly when, in a case like this, there's so many other reasons that you wouldn't even reach the question. It is, I think, effectively... So many other reasons. You mentioned the facial clause. Yes. There's a problem that there's a facial challenge here. And then there's a problem with each of the other winner factors. There's no demonstration that the district court abuses discretion in finding a lack of irreparable harm. And there's no demonstration that the district court abuses discretion in balancing the benefit and burden here. Counsel, is there any reason that the plaintiffs are foreclosed from bringing a takings clause claim at some point? I'm not aware of any reason. As to landlords generally, as to this plaintiff, I'm not sure. It's an association of landlords. I don't know how they would demonstrate, for the purpose of associational standing, be able to demonstrate damages or to be able to prove... The association aside, interesting question, association aside, if we had a group of landlords that came and brought an action in the future for takings, is there anything in this case that would foreclose them from bringing a takings claim? I'm not aware of anything that would foreclose them from bringing a claim. Obviously, I'm not conceding that it would be a valid one. I understand. But I'm not aware of anything that would foreclose it. And that's one of the problems here that the district court recognized when it comes to irreparable harm. These are injuries that, to the extent they exist, and frankly, at the point that the plaintiff here moved for a preliminary injunction, hypothetically exists, could later be compensated economically, whether by takings claim or some other measure, whether perhaps by the government's own distribution of benefits to landlords to try and offset some of this pain. I think... If we are to do the reasonableness analysis and recognizing your point that if this went on 20 years, things start to look a little different, what are the features of this law that you would point to as sort of relevant for its reasonableness that distinguish it from some of these other hypotheticals where maybe we're going to have some serious questions? Well, the first thing I would say is that this court's precedent and the Supreme Court's precedent require a lot of deference to the city council in deciding what is and what isn't reasonable here. Energy reserves explicitly says you defer to the legislature. This court's majority holding in RUI and Judge Bidey's dissent both recognize that ordinarily we would defer, and this is quoting from Judge Bidey's dissent, ordinarily we would defer to the city council on the question of the ordinance's reasonableness and necessity. So beginning from that perspective, what we have here is an ordinance that's time-limited. It's limited to the state of the emergency. Now, I understand my friend may then say, well, what limits the state of the emergency? There are practical limits on these things. Just as there would be in any case if we were talking about straight rational basis review in a due process clause challenge, for example. There are limits on what a legislature or a government can do. In those cases, and I think in this case too, they're primarily imposed by the practicalities of running a government. You could not suspend rents forever and force many building owners into foreclosure and continue to run a government on that basis. You'd lose office. There would be other pressures applied from outside that would sort of correct the problem. In this case, under this law, if the landlord believes that the tenant does not have any COVID-19-related impediment to payment, and is just simply withholding rent even though they're earning a salary that would more than sufficiently cover the rent, what can the landlord do in that situation? They can do exactly what they could do before. They could, under the city ordinance at least, they could still seek to evict. The only question that arises then, the ordinance gives the tenant an affirmative defense, which is the tenant can then say, I have a COVID-19-related difficulty that they'd then be forced to prove because it's an affirmative defense. So the answer to your question, Judge Bress, is that as a practical matter, it does nothing to impede the landlord in those circumstances. I recognize Mr. Dennington said otherwise, but that's just not true. The landlord can proceed as usual. As I said, it's only the addition of an affirmative defense. The tenant can come forward and sort of inform the landlord, you know, I do have this COVID-19 difficulty. And at that point, the landlord, it seems, has a choice either to essentially disbelieve that and proceed or to – and there are some penalties associated with it at that point if it turns out the landlord's wrong. That's correct. There are penalties if the landlord is wrong. There's a 15-day window in which to cease his attempt to evict the tenant after the tenant has shown that he has COVID-19 – he or she has a COVID-19-related difficulty. I should point out, by the way, that the state law in this area requires a landlord to give notice of the state's remedies when a tenant hasn't paid rent. So as a practical matter, even in the city where it's unnecessary to produce a declaration, if that's the sticking point here, probably many tenants will because they're going to be getting a notice that says under state law you should provide this declaration. Incidentally, there's further incentives given to tenants under state law if they make such a declaration. So that bit of proof, if it's a sticking point, is already out there. Council, is there any evidence that any of the rental agreements, the contracts here at issue, are contracts that are the responsibility of the city, so the city is self-dealing? There is no evidence of that. The only rental agreement in the record is AGLA's form rental agreement. As far as I'm aware, AGLA is not representing anyone who is a lessee of the city or somehow related to the city contractually in this case. So there is no – I suppose the thrust of the question is whether there is an instance where you would resort to the kind of analysis in U.S. trust or a case of that nature, where there is an allegation of self-dealing on the part of the municipality. And that's just not the case here. There's certainly no evidence of it in the record. I think we've covered the necessary ground. The bottom line is that given the standard of deference to which the city council is entitled, given the undisputed fact that we're in a once-in-a-lifetime-if-not-longer state of emergency, given the burden falls to the city council to adjust the harms and benefits of economic life in the city, and to make a perfectly reasonable decision that it's best to avert mass homelessness at the expense of imposing perhaps a compensable economic loss on landlords. There is nothing, I think, that Mr. Dennington has shown in his briefs or said today to show that the district court here abuses discretion in denying his client a preliminary injunction. Unless the court has any further questions, I'm content to submit there. I guess I do have some other questions just to make sure I fully understand. I asked Mr. Dennington, you know, in the modern contracts clause era, is there any court that's struck down a law as unreasonable? And he mentioned a few cases that I've also looked at. Do you want to respond on that point? Yes, I would like to respond. Thank you for prompting me because Mr. Dennington was wrong about both of those cases. U.S. Trust is a case involving government self-dealing, so it's subject to a higher level of scrutiny. And in Allied Structural Steel, there was a finding that there was no emergency necessitating the state of Minnesota's action. And before you get to the question of whether the state's action was appropriate and reasonable, as you would ask when you're talking about private contracts, you have to ask first the question whether it was responding to a significant and legitimate problem. I think there was no showing in Allied Structural Steel that there was a significant and legitimate problem. Here, it's undisputed that there's a significant and legitimate problem. What do you make of the points Mr. Dennington was making about some of the earlier cases and how they seem to view rent? I think he would say it's sort of dispositive, but I'm not sure you would agree with that. So maybe you want to give us your take on that? Sure. I don't agree with it, but they're, in my opinion, not difficult to distinguish. It's hard to say in a case where you're talking about a foreclosure. Let me back up. If you're talking about a foreclosure, it's one thing to say you can pay some reasonable rent or some reasonable portion of the mortgage. If you're talking about paying rent to stay in the property, if you're talking about paying rent, what are you talking about forcing the tenants to pay? Would Mr. Dennington be content if the city said the tenants must pay the federal post-judgment rate of interest for month-to-month to stay in their property? Well, that's, last time I checked, six one-hundredths of a percent. So, and I think there's law in this circuit that that rate can be presumed reasonable. It's price versus stevedoring services. So, I don't know what conditions you would apply here to approximate the conditions that existed in those cases. It's a different set of facts. I'm not sure that you can map the requirement of rental payments or partial mortgage payments onto the conditions that exist here and now in the city. Or that it would be necessary, given that the city council, again, only had to act reasonably. If there are no further questions, I'll submit there and let Mr. Nath pick up. Okay. It sounds like there are not. And so, we'll go ahead and hear from Mr. Nath. Thank you. Thank you, Your Honors. May it please the Court. Rohit Nath on behalf of Defendant Intervenors SAGE and ACE Action. Judge Brass, I'd like to start with the last question you asked, which was about AGLA's argument that there's some requirement under the Contracts Clause that there be interim rent during a period in which a landowner cannot repossess his or her property. The easiest way to dispose of this case is exactly that. Because even if AGLA's right, and they're not correct about that, but even if AGLA's right that that were a requirement under the Contracts Clause, the district judge below found that there actually was a requirement for interim rent payments or the city has provided for interim rent provisions to landlords for the duration of the emergency. And that is the Emergency Rental Assistance Program that the city set up in tandem with the eviction moratorium. That Rental Assistance Program provided for about $100 million worth of rental assistance as of December of 2020. And since December 2020, since the district court's decision, the program has ballooned to over $300 million. And that figure doesn't even account for additional funds provided by federal legislation from March of 2021. And it also doesn't account for Governor Newsom's plan announced this week, which is a multibillion dollar plan across the state of California, which will across all of these programs will provide money directly into the pockets of landlords who might have tenants who are struggling. And that also answers... Does the record tell us, you know, whether AGLA's members have received any of this money? Do we know? Your Honor, there's nothing to suggest that AGLA's members have not received this money. AGLA, the record in its entirety is that AGLA has provided our declarations from five landlords across AGLA's 10,000 members. None of those landlords, to the best of my recollection, indicated one way or another whether they ultimately received this money at the point of time of the district court's decision. But what is clear and what AGLA has admitted is that the $100 million that was originally funded, this program was distributed and exhausted, and there are now well over $200 million coming back to the program. And this also answers, you know, Judge Bybee had asked or had made the comment that it's possible to assume that many landlords may not ultimately be paid back rent owed. And that is not an assumption that this court should make, honestly, because there is a substantial reason to believe that through these massive rental assistance packages that provide money directly to landlords, that landlords are going to receive back rent, possibly enough to cover the entirety of the total rental debt across the city of Los Angeles. There's a projection cited in the city's opening brief, the city's answering brief that suggests that. And all of this is to show that this is an evolving, complex legislative problem that requires a legislative solution. And the city is trying to basically kick one leg out of the stool. Or sorry, AGLA is basically trying to kick one leg out of the stool. But Blaisdell tells us, as your honors have recognized, that this is precisely the type of policy judgment to which the city's entitled deference. This is not the only eviction moratorium in the country right now, either city or statewide level. Do you have any sense or is there anything in the record as to how the terms of this one compare to other ones out there? Sure, your honor. So some of the other eviction moratoriums across the country have almost all uniformly been upheld. The New York moratorium is, I believe, currently up on appeal. That moratorium, I think, expired about a month ago. As far as other moratoriums across the country, I candidly can't. I'm not sure whether they're currently in place. I'd like to turn to Judge Vibey, who also asked a question about whether AGLA could bring a takings claim. I'd like to clarify one thing. AGLA has brought a takings claim here. It is in their complaint, and they didn't raise it in their PI motion, likely for the strategic decision, because injunctions are unavailable for takings claims. But there is a takings claim in the complaint. AGLA has eliminated any damages claims from their complaint, so presumably that takings claim in the complaint is not meritorious, and we obviously think that it fails on the merits. But AGLA is fully able to litigate that claim to the final resolution of this case. Lastly, I'd like to touch briefly on irreparable harm with the time I have left. The district court entered a factual finding that landlords were unlikely to face foreclosure, which is the sole basis for AGLA's irreparable harm contention, and that's entitled to clear error. There are over 10,000 AGLA members, and AGLA provided five declarations. Not a single one of those five landlords had even received a notice of foreclosure. So there is simply not a likelihood that any of AGLA's members will face irreparable harm here, certainly not to the point of the district court's finding being clear error. Okay. Thank you, Mr. Knapp. We greatly appreciate your argument, and we'll turn back to rebuttal. Thank you, Your Honor. Picking up on irreparable harm, I think this court's decision in University of Hawaii Assembly, Professional Assembly v. Cayetano, is dispositive. That is a case where the university tried to convert a predicted payroll system to an after-the-fact payroll system, resulting in six pay lags of duration one to three days during the course of the year. This court not only found that that to be a substantial impairment of the collective bargaining agreement, at least the implied term that was based on course of conduct, but also held that that was constituted likely irreparable harm. Likely irreparable harm. And why is that? Because people depend on the timely payment of their income streams. And when you do not receive that timely payment, you're going to miss your payments. And that can lead to embarrassment. That can lead to a host of other issues, credit history problems. And that is irreparable harm. And this court didn't have any problem finding that that was irreparable harm, even if there were monetary damages available for this one-to-three-day delay, which would have been a breach of the collective bargaining agreement. With respect to the rental assistance, Your Honors, this is a red herring. Rental assistance, we welcome it. We absolutely welcome it. But those aren't where the tenants – if the tenant has the money to pay rent, they aren't invoking the ordinance. And so it's all relevant applications of the eviction moratorium that we're looking at. And we're not looking at tenants who are paying rent. They are not seeking protection under the ordinance. Counselor, your time is pretty much gone. I do have one last question, which is I'd like you to respond to Mr. Eisenman's argument that you can't survive a facial challenge here because some of your claims apply to contracts that were signed after the moratorium went into place. Well, again, this goes to the facial challenge and relevant applications. We're only seeking to enjoin the ordinance with respect to those agreements that were in place as of the date of the ordinance was mandated. Your time is up, Mr. Dennington. But let me ask my colleagues if they have any other questions for you. Do not. No. Okay. We'll let you go a little bit over. And so, Mr. Dennington, I'm going to conclude today's argument. We greatly appreciate your arguments. We appreciate the arguments of all counsel in this case that's submitted. That also concludes our calendar for this morning. And we will be adjourned until tomorrow morning. Thank you all. Thank you. This court for this session stands adjourned.
judges: Bybee, Cardone, Bress